*E. A. Hawkins,* for defendant.

---

FIDELITY & DEPOSIT COMPANY *v.* BUTLER, receiver.

1. It was agreed between a guardian and a surety company, that, if the latter would become surety on the bond of the former, he would deposit the wards' funds in some bank in the city of the guardian's residence, to be approved by the surety, and that no part of this money should be withdrawn without the joint check of the guardian and the surety through its local representative. The arrangement was stated to the bank's officers. Deposits were made, and afterwards an interest-bearing certificate of deposit was issued to carry into effect the agreement of the parties. It certified that the guardian had deposited a named sum payable to the order of the surety. This was received by the guardian and retained, with the understanding between him and the surety that no part of the fund should be withdrawn from the bank without the joint check of the guardian and the surety, and that if the whole should be withdrawn at once, the certificate of deposit should be indorsed jointly by them. *Held,* that such an arrangement had the effect to surrender in part the custody and control of the wards' funds to another than the guardian appointed by law, and to put it beyond the power of the guardian to withdraw the fund in case of an emergency; and that it was contrary to public policy.

2. Where the bank failed, and a receiver was appointed under the national banking laws, and he took up the certificate of deposit, and, on proof of the claim by the guardian, issued to him a certificate showing the amount due him, and later paid to him certain dividends declared from the assets of the bank, without the indorsement of the surety; although

the guardian died without accounting therefor, and the surety paid the amount of such dividends to his successor in the guardianship, this did not give the surety a right by equitable petition to claim to be reimbursed from the remaining assets of the bank in the hands of the receiver.

3. Evidence that the purpose of the surety in making the arrangement was to prevent the guardian from making illegal investments or withdrawing funds from the bank without proper authority from the court of ordinary, and to enable the surety before signing the checks with the guardian to investigate the legality of the proposed withdrawal and disbursement, was properly rejected. The contract or agreement which was made could be shown, not the purpose of the surety in making it.

4. Evidence that it was the universal custom for surety companies to require all funds deposited in bank by guardians for whom they were sureties to be withdrawn only upon the joint check of the guardian and surety was properly rejected. The custom of surety companies can not change the law.

Argued June 8, 1907.—Decided February 26, 1908.

Equitable petition. Before Judge Felton. Bibb superior court. November 30, 1906.

*Erwin & Callaway* and *John P. Ross,* for plaintiff.

*Miller & Jones* and *J. C. Morcock,* for defendant.

LUMPKIN, J. Wadsworth was appointed guardian of two minor children, and executed a bond as such, in the sum of $2,000, with the Fidelity and Deposit Company of Maryland as his sole surety. He agreed with the company, that, if it would become surety on his guardian's bond, he would deposit his wards' funds in some bank in the city of Macon, to be approved by the surety, and that no part of this money should be withdrawn from the bank without the joint check of the guardian and the surety, through its local representative. The guardian deposited money in a certain bank, and subsequently agreed with the surety to take an interest-bearing certificate for the amount on deposit. He and the local representative of the surety stated to the proper officers of the bank the agreement which had been made, and to carry it into effect a certificate was issued. It certified that the guardian had deposited in the bank $800, payable six months after date, to the order of the Fidelity and Deposit Company of Maryland, on return of the certificate, with interest at four per cent. for the time specified. It was delivered by the bank to the guardian in the presence of the representative of the surety, and was accepted and retained by the guardian with the understanding between himself

and such representative that no part of the fund should be withdrawn from the bank without the joint check of the guardian and the surety, and that, if the whole were withdrawn at one time, the certificate of deposit should be indorsed jointly by both parties. This understanding was entered into between them in the presence of the officers of the bank, and stated to them. The bank failed, and a receiver was appointed for its assets under the national banking laws. Upon proof of his claim by the guardian, and after surrender of the certificate, the receiver issued to him a certificate showing the amount due to him as guardian, and later certain dividends were paid to the guardian by the receiver without the check or indorsement of the surety. The guardian having died and a successor having been appointed, and the amounts received by the original guardian not having been applied to the use of his wards, judgment was rendered against the surety for the amount thus paid and not accounted for, and it was satisfied by the surety. Suit was then brought by the surety against the receiver of the bank, by equitable petition, in which it was prayed that it be decreed that the surety had a valid claim against the bank for the amount represented by the certificate of deposit; that it should be allowed by the receiver, and such dividends paid to the surety as had been allowed and paid upon other claims against the bank; that the receiver should recognize the surety as a creditor of the bank in the sum of $800 and interest; and that he should pay the same, or certify it to the comptroller of the currency, to be paid in due course of administration; and for general relief. The court, to whom the case was submitted without a jury, rendered a judgment in favor of the defendant. The controlling question in this case is whether the agreement sought to be enforced was binding on the bank and its receiver, so as to render them liable to the surety company after having paid over funds belonging to the wards' estate to the guardian without the surety joining in a check or in an indorsement of the certificate of deposit. Laying aside for the present any consideration as to whether there would be a difference in the payment of money by the bank before its suspension and by the receiver under the national banking laws of a dividend to creditors, the important question involved is whether the agreement sought to be enforced was contrary to public policy, and therefore not enforceable.

The leading case on this subject is that of Salway *v.* Salway, first reported in 4 Russ. (4 Eng. Ch.) 60. A receiver applied to two persons to be his sureties, to which they consented upon his agreeing that the partner of one of them should attend at the rent days and have the rents paid over to him, which should thereupon be deposited with certain named bankers in the names of the sureties; and that no money should be drawn out except by drafts, the body of which should be written by the surety's partner and signed by the receiver. This agreement was acted upon, and receivership funds deposited accordingly in a certain bank, which subsequently failed. A similar arrangement was then made with another bank, which also failed. A petition was filed to charge the receiver or his sureties with the loss. The rule as to the liability of a receiver for funds collected by him, as declared by the English courts, is somewhat different from that in this State. The Bank of England in that country has an official status as a depository of such funds. If a receiver makes his accounts properly and pays in his funds as required by law, he is not liable for a loss occurring by the failure of a bank in which for the time being he keeps them, unless he is at fault. See General Order, 15 Ves. Jr. 278; Fletcher *v.* Dodd, 1 Ves. Jr. 85, and notes to Summer's edition. In this State there is no official depository, and a receiver is held to a somewhat stricter liability for funds in his hands deposited in a bank of his own selection, to await distribution. See *Ricks* v. *Broyles,* 78 *Ga.* 610; Civil Code of 1895, § 4909. So that the Salway case turned on the point of the legality or propriety of the agreement between the receiver and his sureties. The Master of the Rolls held that it was proper and did not make the receiver liable. He said that if the money had been dealt with so as to place it under the control of others in a manner which would have exposed it to loss or prejudice by the conduct of such other person, there would have been much weight in the argument against such a contract; but that in truth the money was never under the control of the sureties or exposed to loss or prejudice by being placed in their names; that the bankers were specially directed to pay only drafts signed by the receiver, and therefore the fund could not be applied by the sureties for any foreign purpose; that the precautions used were meant to secure the due application of the money to receivership purposes only, and so far were beneficial and not in-

jurious to the trust estate. The case was appealed to the High Court of Chancery (2 Russ. & Mylne, 215), where the decision of the Master of the Rolls was reversed, and it was held that by such an agreement the receiver parted with his absolute control over the funds, and it was therefore not proper. The case was carried to the House of Lords on appeal, under the name of White v. Baugh, and is reported in 3 Cl. & Fin. 44 (9 Bligh (N. S.), 181). The decision of the Court of Chancery was affirmed. It was held that "A receiver can not be permitted to enter into any agreement with his sureties by which he, in effect, indemnifies them against any loss that may accrue from his dealing with the receivership fund. The security for his good conduct must not be worked out of the estate itself. Nor can he be permitted to put the fund intrusted to his care under their control or the control of any person appointed by them, but must retain the complete control over it in himself, so as to be able to act with promptitude on any emergency. It makes no difference in such a case that the arrangement between the receiver and his sureties has not been the direct cause of a loss, nor that neither of them has obtained any personal advantage from it." The opinion delivered by Lord Brougham set out with such force the reasons on which it was based, and has been so frequently cited, that it is deemed not inappropriate to copy from it somewhat at length. It was said: "The main question is, whether or not the arrangement as to the drawing and filling up the checks made the receiver answerable, supposing he incurred no responsibility from the amount of the balance remaining in the bank, and supposing no other neglect or default to have been committed in guarding the fund. Now, it is clearly the duty of the receiver, as an officer of the court, to keep in his own hands the control over the fund. It is admitted that if he had parted altogether with that control he would have been answerable, whether the loss actually incurred could be traced to and connected with that severance and that want of power over the fund or not. Does it make any difference, that instead of entirely parting with the control he gave a veto on all his dealings with it to a mere stranger? The surety's partner, George Anderson, was wholly unknown to the court, which reposed its confidence in its own officer, the receiver, and looked only to him. The acts of a stranger it had no power over, and could in no respect

control or punish. Consider the position of the fund. Had a sudden run come upon the bank, White [the receiver], on hearing of it, would have been bound in discharge of his official duty, his duty to the court, instantly to draw the whole balance out, and put it in a place of greater safety. But the arrangement which he had made prevented him from doing this without the concurrence of Adams' [one of the sureties] partner, Anderson, who lived at some distance, and who, even had he lived in the same town, might have been absent or unable from illness to act, and who, had he been both on the spot and able to write the checks, might have been unwilling and might have refused. He might have been disposed to court the favor of his own bankers at the risk of this particular estate. . . But without making any such supposition, and simply considering the provision made for the checks being all drawn by Anderson, only let us ask ourselves how any individual would like, during a run upon his banker, to have his hand paralyzed by such a veto as was given to Anderson; what anxiety would he feel during the delay that must elapse in the interval between the run beginning and the messenger returning with the checks filled up for his signature. Is a receiver entitled to place the custody or administration of the fund in a situation, which, in the case of any individual dealing with his own estate, would be the source of such anxiety? . . Now the court has a right to a security quite independent of the receivership, and not a security which is to be as it were worked out of the estate itself. No one would find it a very hard matter to get a surety if he could give him a control over the funds. . . Again, an interest is given to the surety or his partner to court the bankers, by keeping the balance of the estate large, and thereby obtaining accommodation on his own private account; surely no such risk should be run, and any benefit derived from the account should rather go to the estate than to a stranger. But if it be said that the surety can only put the receivership fund in jeopardy at his own risk, because the loss will certainly fall on the receiver and himself if it can be traced to the balance being left too long in the bank or other place of deposit, then I answer that there are three considerations sufficient to destroy the whole force of this observation." (After noticing that in this case it was not the surety, but his partner, who had the veto power, and the difficulty of tracing the connection

between the loss and the arrangement, the opinion then proceeded.) "And, chiefly, supposing no such difficulty to exist, the court and the estate have a right to be guarded against all risks which would call in the aid of the surety, or indeed of the receiver himself; for it is by no means right to say, 'If the bank breaks, and the receiver and the surety have been negligent, we come upon them.' . . But independently of any such consideration, it is to be remarked that on all hands it is most explicitly admitted that the receiver, wholly parting with the control of the fund, would have made himself answerable, whether the loss had arisen from that cause or not. This rather differs, therefore, in degree than in kind from such a case. He relieves himself from the fetters imposed upon his own custody and management of the funds, by sharing that management with another, and giving that other as much power over it as himself; such power, indeed, that without filing a bill in equity and obtaining an order of the court, he had no means of drawing out one shilling of the fund, if the person intrusted with the veto refused to permit him to do so."

The facts of that case were not identical with the one now under consideration. The fiduciary there dealt with was a receiver, which made the case stronger. A receiver is the hand of the court, and no third person, whether surety or not, can be allowed to intervene between the order of the court and the act of the receiver. If the court gives direction about the control and management of funds, the receiver must promptly perform his duty and obey that direction. He can not be required to ask the consent of any other person, or the concurrence of such person, in drawing out funds when the court so orders. In the case referred to it was also true that the deposit was made in the names of the sureties, and that the person who was to join in preparing the drafts for drawing the funds was a partner of one of the sureties. But a difference as to these last-mentioned facts would not have affected the decision; for there was no claim that the sureties used or intended to use the funds for their own benefit, but this was a mode of checking on the receiver, and it was not material whether a surety himself was to join in making the draft or his partner, who for that purpose was thus constituted his agent. Allowing for these differences, it will be seen that the reasoning in that case is applicable here. The authorities are not numerous on the subject of re-

linquishing control in whole or in part to a surety, or of securing the surety with the estate itself for which he was intended to furnish indemnity against loss; but so far as we have been able to find authorities on the subject, they have generally followed the line of reasoning in the case of White *v.* Baugh, above cited. In Poultney *v.* Randall, 9 Bos. (N. Y.) 232, a guardian brought suit in the superior court of the city of New York against another, to recover moneys collected by the defendant for the guardian. The defendant admitted that he had in hand a certain amount belonging to the infant, but set up, by way of defense, that he became surety for the guardian upon condition that he [the defendant] should receive and collect the rents and income belonging to the infant, so that he might hold himself safe and harmless in case of the default of the guardian to fulfill the condition of the bond; that the guardian executed a power of attorney to him for that purpose; that the guardian was insolvent, and if the defendant was compelled to pay over the moneys he had collected, the guardian could not pay the the said bond, and that such payment would fall wholly upon the defendant. The presiding judge directed a verdict for the plaintiff. The case was carried to the general term, where the decision was sustained. It was said: "An agreement betwen the guardian of an infant and the person becoming surety in his official bond, that the latter shall hold the property of which the guardian is custodian, for his own indemnity, is void, because subversive of the objects of the appointment and security, and contrary to public policy. The guardian can not pledge the property of his ward as security to his own surety. Hence it is no defense, in an action by the guardian, against one who has collected moneys of the estate and refuses to pay them over, to show that the defendant became the guardian's surety upon such an agreement, and that the guardian is insolvent, and to offer to pay the money into court." This case was cited approvingly by the Court of Appeals, in Deobold *v.* Oppermann, 111 N. Y. 541. In the last-mentioned case it was held that an agreement made at the time the sureties executed an administrator's bond, that the administrator should deposit with them the proceeds of the estate, to be retained until they were discharged from liability on the bond, and with authority to use the proceeds in their business, was contrary to public policy. Express authority to use the proceeds made that case

stronger than the Poultney case in 9 Bosworth; but the former ruling was approved. In 1 Perry on Trusts (3d ed.), §443, it is said, that a trustee may temporarily deposit money in some responsible bank; but that he will be liable for the money in case of a failure of the bank in certain cases, among them being, "If he deposits the money in such manner that it is not under his own exclusive control, as where money is deposited in bank so that it can not be drawn without the concurrence of other persons, the trustee will be liable for the failure of the bank, on the principle that it is the duty of the trustee to withdraw the money from the bank upon the slightest indication of danger or loss, and he can not perform this duty promptly if he is clogged by the necessity of procuring the concurrent action of other persons." The author cites the English cases already discussed, as authority for the text. In Lewin on Trusts and Trustees (2d Am. ed.), 308 (*334) it·is said that "A trustee must not lodge the money in such a manner as to put it out of his own control, though it be not under the control of another." The case of White v. Baugh is again cited. In Green-hood on Public Policy, 155 (F), it is said: "A agrees with B, his surety on his guardian's bond, that the latter shall hold the property of the ward to secure himself against any loss arising from his undertaking. The agreement is void." The case of Poultney v. Randall, 9 Bosworth, is cited as authority for the proposition. These citations from text-writers depend upon the authority of the cases already discussed; but they are made to show that those decisions have not been construed as restricted to receivers alone, or to cases where it was agreed that the surety should use the fund.

In McCollister v. Bishop, 78 Minn. 228 (80 N. W. 1118), suit was brought against one Bishop, who had been the assignee of an insolvent corporation, and the Fidelity and Deposit Company of Maryland, the defendant in the present case, as surety. It was alleged, that when Bishop applied to the Fidelity and Deposit Company to become surety on his bond, that company made it a condition precedent to doing so that he should agree that all the moneys and funds belonging to the estate in his charge which should come into his hands should be deposited with a certain named trust company, to which Bishop assented, and inserted this as one of the conditions of his written application to the company to become his surety; that at the time the surety company had full

notice that the trust company was insolvent, and was not a secure and safe place to deposit money, but represented to him that it was safe and reliable; that he believed this, and deposited funds with the trust company, which was not in fact solvent, and which afterwards failed, having on deposit $5,763.91 to his credit. It was held that the complaint stated a cause of action against the surety company, at least for fraud and deceit. It was also held, that "If a trustee enters into any arrangement with reference to trust funds which surrenders or limits his control over them, he becomes a guarantor of the fund, irrespective of his motives, or whether his surrender of control was the cause of the loss of the fund;" but that the facts did not bring the case then before the court within the rule. In discussing the matter of the agreement Mitchell, J., said: "The principle invoked is, that, if a trustee enters into any arrangement with reference to the trust funds which surrenders or limits his control over them, he is guarantor of the fund, irrespective of his motives, or whether his surrender of control was the cause of the loss. This undoubtedly is the rule, and it is an eminently salutary one. But in our judgment the facts pleaded do not bring this case within it. It is customary, as well as entirely proper, for these fidelity companies, before executing bonds as surety, to insist on being advised, and having some understanding with their proposed principal, as to where the trust funds will be deposited. This is a matter which affects the risk which they will assume if they execute a bond. It also enables them to keep track of the conduct of their principal with regard to the disposition of the fund. The facts pleaded in this case do not show any surrender, in whole or in part, of the principal's absolute control over the trust fund. He had the right to deposit the money in his own name as assignee. He had the right to draw it out as he saw fit. His surety had no control of, or veto power over, these matters. He had the absolute legal power to change the depositary whenever he saw fit." It may be inferred that had he not retained such control, or had he known of the insolvency of the trust company, the ruling would have been different. In the case now before us the guardian agreed to deposit his wards' funds in some bank in the city of Macon, to be approved by the surety, and that no part of this money should be withdrawn from the bank without the joint check of the guardian and the surety, through its local representative. When the general deposit

was changed into the form of a certificate, this was certified to be a deposit by the guardian payable to the order of the surety. Such an arrangement not only made the selection of the place of deposit subject to the approval of the surety, or practically to its selection, but also sought to place it in the surety's power to prevent the guardian from withdrawing any of the fund, or changing the depository without the assent and joint action of the surety. This was palpably a veto power. No matter how much danger there may have been to the fund, no matter whether there was a run on the bank or not, the guardian could not withdraw the fund, under this agreement, except with the concurrent action of the surety. In fact the bank failed, having the fund on deposit, and only partial dividends have been declared and paid to creditors. It does not meet this position to say that if the surety caused loss to the estate, it was liable on the bond. The law does not provide for turning over the control of the estate to the surety, in order to guarantee him against loss, or, in other words, indemnifying the surety against loss with the assets of the estate. If so, why would it be any more illegal to allow a guardian to contract directly with his surety to deliver the funds of the estate to the latter? Nor will it answer to say that it is to the interest of the surety to see that the estate is rightly administered, so that it may not be liable on the bond. The same argument could be urged with equal force in favor of an agreement to deliver the money of the estate to the surety, to be paid out in such manner as would be lawful and would relieve it from liability. It might be said that the surety was more responsible than the bank of deposit; but certainly not all sureties are so, and an agreement can not be valid or invalid according as the tax returns of the surety rise or fall.

In Wilder v. Butterfield, 50 How. Pr. 385, two of the sureties on the bond of a municipal tax-collector, who were partners, before signing the bond agreed with the collector that the latter should deposit the taxes collected by him, from time to time, with the former, and for so doing they would allow him a certain sum as interest, and would become sureties, individually, upon his bond. The firm failed. It was held that the two partners by entering into such an agreement with the collector, which was void as against public policy, thus aided him in committing a breach of trust, and in putting it out of his power to execute his duties of collector, as they

severally had by their bond undertaken that he should do. See also Forsyth *v.* Woods, 11 Wall. 484; Eichelberger's Appeal, 4 Watts (Pa.), 84; Lee *v.* Lee, 67 Ala. 406, 417; 21 Cyc. 78.

Bonding and guaranty insurance as a business is of recent growth in this State. When the original code, which took effect January 1, 1863, was adopted, it was required that official bonds of public officers should not be approved unless they had at least two good and solvent sureties and not more than five, all of whom should be permanent residents of the State, and two also of the county, and freeholders thereof. The number permitted was later made ten (Acts 1863-4, p. 124), and afterwards twenty (Acts 1889, p. 45). In 1889 guaranty or security companies incorporated under the laws of this State were allowed to become one of the sureties or the only surety on official bonds of State or county officers, as the solvency of the company might warrant (Acts 1889, p. 178), Civil Code of 1895, §§ 246, 247. In 1896 an act was passed to authorize solvent guaranty companies, surety companies, fidelity insurance companies, and fidelity and deposit companies to become surety upon attachment bonds and upon the bonds of city, county, and State officers, providing remedies against such bonds. It provided for depositing bonds of the United States or of this State, to the amount of $50,000, with the State treasurer, and other matters not material here (Acts 1896, p. 58). In 1897 the amount of bonds required to be deposited by such companies with the treasurer was reduced from fifty thousand dollars to twenty-five thousand dollars (Acts 1897, p. 60). As to various other bonds besides those of public officers the law had provided that the sureties should be good and sufficient and should be approved by some named officer. It has generally been held that administrators, guardians, and trustees must furnish their own bonds without expense to the estate. But in 1903 an act was passed "to authorize administrators, executors, trustees, receivers, and guardians, who are required by law, or [by] the proceedings appointing such officers, to give bond, to charge costs or premiums paid for such bonds as costs or charges against the estates which they represent, or in the proceedings in which they are appointed, and to authorize allowances of such charges or premiums by the judges of the courts of ordinary or other officers or judges under whose jurisdiction such proceedings are pending, or by whom such appointments are made." In the body of the act it is limited

to cases where bonds are given with guaranty, surety, fidelity insurance, or fidelity and deposit companies as sureties. (Acts 1903, p. 75).

These companies have rapidly grown until they do a considerable part of the business of giving sureties. In some respects they have proved very useful and convenient. Instead of applying to a friend or an acquaintance and urging him to go on one's bond, a person required to give a surety obtains one or more of these companies to sign his bond for a consideration. It becomes a matter of business, and doubtless sometimes results in more businesslike methods. At the same time there is no law against giving individual surety. Such companies may be safe and solvent, but the assets of those not incorporated in the State, which are required to be held here, are limited, the present requirement being that there must be a deposit of $25,000, in bonds. Perhaps their actual conduct in regard to assenting to the withdrawal of funds deposited by a guardian may have ordinarily been businesslike in the past in this State. We do not decide as to this. There is no evidence on the subject. But whether it has been so or not, in determining a general rule as to the validity and binding force of a contract of the character here involved, we must remember that all surety companies may not be equally good, and with a change in management the same company may not always act in the same way. The power and temptation to favor a bank in which it may have an interest, or with which it may exchange favors, is not less where a corporation is the surety than where an individual is so. The courts can not say that a rule of public policy shall apply in favor of such companies, but not in favor of individual citizens, who may become sureties on bonds. If it should be held that a contract by which such companies should in whole or in part control or have power over funds belonging to guardians was valid and binding, the same rule would have to apply to individual sureties. Let us suppose that an individual had been the surety on the bond here involved. Under the rule sought to be established, why could he not have required the funds to be kept in a bank in which he was interested or where he obtained accommodations, or perhaps to which he was a debtor. If there had been a run on the bank, could the surety not have said, "I will not join in drawing out funds, lest it tend to produce a failure?" Or

·might he not have accomplished the same result by merely being inaccessible to the guardian? And, in effect, why might he not have required the guardian to have kept the fund in bank against his best judgment, and when it was evidently dangerous? It does ·not suffice to say that, if he did so, he would render himself liable ·as surety. He might or might not be thoroughly able to answer ·therefor. The very failure of the bank which he might thus favor might involve him in insolvency. It might also ,be very ·difficult to trace the loss directly to the contract.

Guardians may apply to the judge of the superior court to sell ·and reinvest their wards' estate. Civil Code of 1895, §2545 et seq. . Without any order a guardian may invest the funds of his ward in bonds or other securities issued by this State. Civil Code, ·§2551. And under an order of the superior court he may invest funds held by him in lands. Civil Code, §3432. Suppose that the surety should prefer that the money in the hands of the guardian should not be reinvested, but should remain in the bank, does the law contemplate that he shall have such a veto power? If the contract set up in this case were held to be valid and binding, could the guardian be punished or held liable as being in default for complying with it? If it were held to be a lawful and proper contract between the guardian and the surety to such an ·extent as to authorize a recovery by the surety for its breach, what ·effect would be claimed if the guardian violated the agreement and ·suit were brought on the bond? Surely it would not be claimed that such an agreement or its breach would in any way affect the right of recovery for the benefit of the wards on the bond, or that the indemnity furnished by the bond could be in any way made subject to a private contract between the principal and the surety. Let it be noted that the agreement set up here is not as to the .guardian's money or property, but in respect to the funds of the wards. Besides, this particular agreement does not provide for any payment by the guardian, even where the law authorizes or ·requires it, except upon the joint act of the surety and his prin- ·cipal.

As to the amount which the surety has paid to the successor of the original guardian the following appears from the agreed statement of facts used on the trial: The certificate of deposit, principal and interest, amounted to $807.10. The dividends paid to

the original guardian aggregated $684. The balance due to him or his successor in said trust "on said aforesaid certificate is now held by the Comptroller of the Currency in the Department at Washington City, and subject to the demand of the parties rightfully entitled thereto." The first guardian died and a successor was appointed. The surety cited the second guardian for a settlement of the accounts of his predecessor in the trust, and a judgment was rendered against the surety for $529.29 and costs. In payment and satisfaction of this judgment the surety paid to the second guardian the sum of $542.29 principal, interest, and costs on the judgment so awarded, "that being the amount collected by Wadsworth, guardian, from the receivers aforesaid, and not applied to the use of his wards." Thus apparently the judgment and payment did not include the entire amount of the deposit in the bank which failed, but only the dividends paid and not accounted for. Such deposit was made with the approval of the surety, and, it claims, could not be withdrawn without its concurrence. If it should assert the position of not being liable absolutely for the deposit, on the ground that the guardian acted with proper fidelity and diligence in making such deposit, is it consistent with this contention to have placed the guardian in a position where he could not have withdrawn the amount deposited, no matter how great the danger, how pressing the emergency, or how apparent his duty to withdraw the funds of the wards? How stands the balance of the claim against the assets of the bank in the hands of the receiver? Does the surety contend that it can prove the claim and receive the money, if further dividends should be declared? If the payment to the guardian of the dividends already declared was illegal, and rendered the bank or its receiver liable to again pay the amount of them to the surety, how should they have been paid? Should they have been jointly paid to the guardian and his surety, or to the surety alone? Dividends were declared to be paid to the creditors of the bank. Who was the creditor of the bank in this case? If the surety contended that it was the creditor instead of the guardian, this involved the claim that the fund or the title to the deposit had been transferred by the guardian to the surety. If this were so, not only dominion and control but actual title had been surrendered to the surety. If the contention be that the dividends declared should have been

paid to the guardian and the surety jointly, then this involves
the claim that they were joint creditors. If so, would not the
guardian have at least in part transferred the control of the funds
to another? If it be conceded that the guardian was the real
creditor, and that the funds were guardianship funds, then the
contention resolves itself into this: that where a bank held trust
funds on deposit, and the receiver of it paid them to the duly
appointed guardian and proper custodian, the receiver can be held
liable for doing so; that is that payment to the person appointed
by law to hold the funds is illegal unless by the consent of his
surety, because of an agreement between the latter and the guard-
ian, limiting the guardian's power to receive his ward's funds
from a broken bank. In the case of *Rogers* v. *Hopkins & Glenn,*
70 *Ga.* 454, it was said that "It is not illegal or against public
policy for a guardian to agree with the surety on her bond to in-
vest her ward's money, when received, in State bonds, and deposit
them with the surety, to indemnify him against loss as such, there
being no other funds in her hands except those to be thus invested;
and her attorney, who in good faith aids her in attempting to carry
out such an agreement, is not liable if there be a loss of the fund
while in his possession, and without fault on his part, before the
investment is made. Especially is this true where the evidence
shows that the failure to make the investment before the loss of
the fund was caused by the fault of the guardian." In that case cer-
tain lawyers collected the amount of a life-insurance policy payable
to the widow and children of the deceased. In order to obtain
a surety to sign her bond as guardian, she agreed with the presi-
dent of a bank that the ward's part of the money should be
invested in bonds [presumably State bonds] which should be held
by the surety. One of the attorneys received a draft for the
amount of the insurance, collected it through the bank with whose
president this agreement had been made, drew out the amount of
the fees, leaving the balance on deposit, and notified the widow
that she could get her share on application, and that the president
wished to see her about the share of the children. She became dis-
satisfied in regard to the fee charged her, and, though advised by
a person with whom she consulted to remove the money from the
bank at once and warned of the danger of leaving the funds on
deposit, did not withdraw them, and took no action for fourteen

days, when the bank failed. The fee charged was in fact reason-able and fair, and there was no ground for the course taken by her. The act of the attorney in regard to the surety was merely for the purpose of enabling the widow to procure a security on her bond, and was without compensation. After the failure of the bank, the widow, for herself, and as guardian for her children, brought suit against the attorneys. On the trial the plaintiff requested the judge to charge that a guardian has no right to pledge or put the funds of his ward in the custody or control of the surety on his bond as guardian, and that any contract to do so is contrary to law and void, and that the attorney of a guardian who participates in such an arrangement will not be thereby protected or saved from personal responsibility for acts or omissions for which he would otherwise be responsible. The presiding judge refused to give the charge. In the opinion of the Supreme Court it was said that: "The principle of law requested to be given in charge by counsel for plaintiff is a sound one, but is not applicable to the facts of this case." After referring to the decisions in Salway v. Salway, White v. Baugh, and Forsyth v. Woods, supra, it was said: "The case at bar is totally different in principle from all these. Here the scheme did not contemplate that the funds of the guardian were to pass into the hands of the surety, so as to give him the use and control of them, or so as to deprive the guardian of her right to exercise a proper control over them, but simply that they were to be invested in bonds—presumably State bonds, as they are the only kind that guardians are allowed to invest in, and that these bonds were to be deposited with the surety, not to be used by him, but simply as a guaranty that they would not be misused by the guardian. Such a plan was laudable, and would, had it not been defeated by a failure of the bank, have afforded double protection to the wards. The surety could not have used the bonds, because they would not have been his; and had he done so, would have been guilty of larceny after trust; and the guardian could not have wasted or squandered them, because they were guarded by the surety." As indicated above, that case was not between the surety and the guardian, or between the bank and the guardian, nor was it an effort on the part of either of the parties to it to enforce the agreement or to recover damages for its breach. It was an attempt on the part of the guard-

16

ian to hold her attorney liable, after the failure of the bank, for having aided her to make the agreement, or at least to have it declared that the agreement and his conduct in connection with the matter furnished no defense to him in a suit for the money, although he had merely aided her, or carried out her instruction. Again, under the law of this State, the guardian could have invested the money of the children in State bonds. Had she done so, the title to the bonds would have been in them, or in the guardian, whether deposited with the surety or not. His failure or the failure of the bank would not have prejudiced their right to their property. This would have been a special deposit of property. It was not like money deposited in bank, which may be used by the bank and may be lost by its failure. The decision in that case, considered in the light of the questions involved, does not conflict with the ruling now made, but, at least in part, sustains it.

If the agreement made in the present case was contrary to public policy, a breach of it would not furnish a cause of action. If the surety claimed to have been the owner of the fund, this would have been a conversion in which it took part. If it did not claim to have been the owner of the fund, but conceded it to belong to the guardian or the wards, then payment thereof to its proper custodian did not furnish a cause of action to the surety, unless the contract was a valid and enforceable one, a breach of which gave the surety a right of action against the bank, or a right to be reimbursed out of its assets in the hands of the receiver. This we have just seen was not the case. The surety proceeded by a petition invoking the equity powers of the court. It had no standing in equity, either on the basis of having taken part in an agreement to convert the funds of the wards by placing them in its name, or on the basis of an agreement which we have held was contrary to public policy and not enforceable. In either view, the court exercising equitable jurisdiction properly denied the relief prayed.

We are aware that public policy has been called "an unruly horse," and caution has been urged in mounting it. We agree that care and caution should be employed. But if it be clearly ascertained, the rule of application is fixed by the law which declares that contracts against the policy of the law are not enforceable. Civil Code of 1895, § 3668.

Persons occupying fiduciary positions are not always as careful and exact as they should be in dealing with the money or property of those whom they represent. It may be that restrictions and safeguards are sometimes, perhaps often, needed for the protection of children against waste or misuse of funds by well-meaning though incompetent guardians or trustees, or still more sometimes against knaves who would plunder the weak and helpless; but if so, the establishment of such new safeguards is rather for the legislative than for the judicial department of the government. We can only declare the law as it is. In the light of what has been said, the judgment of the court below was right.

2. Evidence was offered to the effect that the purpose and object of the surety company was to prevent the guardian from making illegal investments, or from withdrawing funds from the bank without the proper authority from the court of ordinary, and to enable the surety company, before signing checks with the guardian, to investigate the legality of the proposed withdrawal and disbursement. The agreement actually made was shown. It was not competent to prove what was the purpose and object of the surety in what it did. This was no part of what was said or done, and was properly rejected from evidence.

3. The plaintiff also endeavored to show that it was the universal custom for surety companies which became sureties on the bond of a guardian to require all funds to be deposited by the guardian to be withdrawn only on the joint check of himself and the surety. If the law is as we have construed it to be, the custom of security companies can not change it. Custom may sometimes be invoked as entering into a contract or supplying incidents, but not to change the law.

*Judgment affirmed. All the Justices concur, except Holden, J., who did not preside.*