[No. 19857. *En Banc.* January 8, 1927.]

RUTH TYLER MECK, *Respondent and Cross-Appellant,*
v. ADOLPH BEHRENS *et al., Appellants.*[1]

[1] LIMITATION OF ACTIONS (59-1)—TRUSTS (59)—COMPUTATION OF
TIME—REPUDIATION OF TRUST. As between a trustee and *cestui
que trust,* the statute of limitations does not commence to run
as long as the trust continues.

[2] TRUST (29)—MANAGEMENT OF TRUST PROPERTY—DELEGATION OF
AUTHORITY. Trustees of an estate, invested with discretionary
powers involving personal confidence and full title to the prop-
erty, violate the trust when they enter into an agreement vest-
ing in a trust company the title and delegating all their dis-
cretionary powers imposed by the will.

[3] SAME (46)—ESTABLISHMENT OF TRUST—RIGHTS OF CESTUI QUE
TRUST—ESTOPPEL. The evidence sustains findings that a *cestui
que trust* did not know of unlawful delegation by trustees of
their discretionary powers, and she was not estopped to assert
liability therefor, where she positively denies such knowledge
and the evidence to the contrary was of a very general nature.

[4] SAME (28)—SUCCESSION OF NEW TRUSTEE. Where trustees un-
lawfully delegated their discretionary powers to a trust com-
pany, they cannot avoid liability by the fact that the contract
made by them was known to the probate court and amounted
to the appointment of a new trustee, where they never resigned
but continued to serve as trustees.

[5] EXECUTORS AND ADMINISTRATORS (143)—ACTIONS AGAINST EXECU-
TORS—LOSS THROUGH DELEGATION OF DUTIES. Where trustees
unlawfully delegated their discretionary powers, they should be
held liable for the value of the property as of that date; and
where the inventory value is the closest possible approximation,
they should be charged with the same with interest thereon at
the legal rate.

Cross-appeals from a judgment of the superior court
for King county, Card, J., entered July 30, 1925, upon
findings in favor of the plaintiff in an action for an ac-
counting against trustees under a will. Reversed on
plaintiff's appeal.

[1]Reported in 252 Pac. 91.

· *Murphy & Kumm* and *Charles L. Harris*, for plaintiff-appellant.

*Karr & Gregory* and *H. G. Sutton*, for defendants-appellants.

PARKER, J.—The plaintiff, Ruth Tyler Meck, seeks an accounting by, and recovery from, the defendants, Behrens, Newell and Cavanaugh, of property held in trust by them for her under the last will of her grandmother. A trial upon the merits in the superior court for King county resulted in findings and decree awarding judgment in her favor against them in the sum of $5,239, and also directing them to pay over to her the sum of approximately eight hundred dollars of the trust funds admitted by them as remaining in their hands. The defendants have appealed, and the plaintiff has cross-appealed.

In April of 1912, Mary Ann Cavanaugh, a resident of Seattle, died leaving a last will. By its terms, after making a small bequest or two, she gave all of the remainder of her property: To three of her daughters and her two sons, each a one-seventh part; to another daughter, a one-fourteenth part; to Nellie M. Tyler and Ruth Tyler, two of her grandchildren, each a one-twenty-eighth part; to two other grandchildren, each a one-fourteenth part. The granddaughter, Ruth Tyler, is Mrs. Ruth Tyler Meck, the plaintiff in this action. At the time of her grandmother's death, she was about twenty-one years of age. The will further provided as follows:

: "I further will and direct that the share or portion of my estate herein bequeathed to my granddaughters Nellie M. Tyler, Ruth Tyler and Mildred Beatrice Cavanaugh, be distributed by my executor and executrix hereinafter named, to Fred Beecher Cavanaugh, Rose Mae Newell and Adolph Behrens, in trust for my said granddaughters; and I direct and authorize said

trustees to hold any or all of said property in trust as aforesaid for the period of ten years from the date of proof and filing of this, my last will and testament, . . . The said trustees shall have full power and authority to sell and dispose of any or all of said property and to agree to a division of said property and estate with the other heirs, and to make such deeds of conveyance or other instruments in writing as may be necessary in the premises . . ."

Her son, Fred Beecher Cavanaugh, and her daughter, Rose Mae Newell, were appointed executor and executrix of the will, which provided that no bonds snould be required of them and that the estate should be settled without the intervention of any court.

The deceased left surviving her, in addition to those heretofore mentioned, her husband. A part of her estate was her separate property and the remainder was the community property of herself and her husband. Shortly after her death, the will was duly probated, and the executor and executrix proceeded at once with the administration and settlement of the estate. They published notice to creditors, and the claims were filed and paid. On or about November 6, 1913, the executor and executrix had substantially completed the settlement of the estate and were about ready to distribute the property as provided in the will. A short time prior thereto, however, some of those interested in the estate seriously objected to the manner in which the executor and executrix were conducting the affairs of the estate, and instituted proceedings in the superior court for King county, seeking their removal and an accounting. It appears that, at this time, a considerable bitterness had grown up among the heirs themselves and between them and the executor and executrix. After the trial of that case, and before any decision was rendered, the parties got together with a view of settling their differences, and

apparently succeeded in so doing by means of an elaborate contract, by which it was agreed to transfer the property of the estate to the Title Trust Company, of Seattle. This contract was signed by the various parties, including the executor and executrix,—the trustees, who are the defendants in this action, signing for and on behalf of this cross-appellant, Ruth Tyler Meck, their *cestui que trust.*

Because of the length of the contract we must content ourselves by giving its substance, in so far as it is important in this litigation. After mentioning the will, it refers to an attached schedule of the property of the estate. It designates the interest of the respective parties in the property, following, at least for the most part, the terms of the will in that respect. It provides that the executor and executrix, the various devisees and the trustees shall convey the title to the property to the Title Trust Company, which shall have power and authority to collect all debts, pay all taxes and assessments, sell any and all property and generally look after it, ultimately accounting to the respective parties according to their interests. Any party to the contract had the right to apply to the Title Trust Company for the sale of any portion of the property, and if any party bought at the sale, the purchase price was to be charged against him or her to the extent of his or her interest in the estate. In this manner, some of those interested obtained considerable of what the trial court called the liquid assets. It is to be noted that the trustees were to act in the future still as the trustee representatives of the cross-appellant, Ruth Tyler Meck, but under the limitations of the contract.

After the execution of the contract, the title to the property was accordingly conveyed to the Title Trust Company, the trustees executing the conveyance for and in behalf of cross-appellant, Ruth Tyler Meck,

their *cestui que trust*. It consisted of several tracts of land and various securities. From time to time the plaintiff received from her trustees small sums of money, aggregating $574, but no more. While she resided in Seattle and was of lawful age at the time the contract was made, she has lived in Ohio most of the time since then. After the expiration of the ten-year trust provided in the will, she brought this action, alleging, among other things, that her trustees had breached their trust in surrendering into the hands of others title to and management of the property belonging to her and had not used their best, or any, judgment concerning its disposition or management, and that, through such negligence and misconduct of her trustees, the property or proceeds thereof which she otherwise would have obtained has been lost.

The trial court concluded that the trustees had no power or authority to enter into the contract or make the conveyance above mentioned, in so far as Ruth Tyler Meck's rights are concerned; that the estate was fully administered upon and ready for distribution to the devisees named in the will, on the 6th day of November, 1913; and that the trustees had been careless and negligent in their duties, resulting in the loss of Ruth Tyler Meck's interest in the property to the extent of $5,239 in value. This judgment was made up of several specified items of loss, conceived by the trial court as being the result of the negligence of the trustees and the negligence of the Title Trust Company, imputed to the trustees. We need not notice these specified acts of negligence and specified items of loss, since we think the appellants, trustees, are liable to cross-appellant, Ruth Tyler Meck, in a larger amount upon another theory of the law to be presently noticed.

[1] We first notice appellants' contentions. They contend that the action cannot be maintained because

the statute of limitations has run. We are satisfied that position cannot be sustained. It is the settled rule that as between a trustee and *cestui que trust* the statute of limitations does not commence to run so long as the trust continues. In *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899, we said:

"Being of the opinion that the land was acquired in trust for Mrs. Ackerson, we think it follows that the statute would not run against her so long as that trust relation existed."

The following are some of the cases and texts supporting this proposition: 39 Cyc. 471; 25 Cyc. 1149; *Irwin v. Holbrook,* 26 Wash. 89, 66 Pac. 116; *In re Sanderson Estate,* 74 Cal. 199, 15 Pac. 753. Here the appellants are still acting as trustees for cross-appellant.

[2] There is an extensive discussion in the briefs as to the effect of the above mentioned contract on the trust created by the will. Under the terms of the will, it was the duty of the trustees, as soon as the executor and executrix had settled the estate, to receive from them the property which they were to hold in trust and thereafter to manage and control it. Instead of doing this, they signed the contract, and thus made it impossible for them to take possession of the property or the interest of their *cestui que trust* therein. By its terms they surrendered to the Title Trust Company almost all the duties that devolved upon them under the will. That company was not only to hold the title to all property, but was to manage and have complete control over it, with power of sale, and was ultimately to pay to the legatees under the will, and this means to the trustees in so far as cross-appellant's interest is concerned, sums of money or property which might be in its hands.

It is undoubtedly the rule that, while a trustee may delegate to someone else a purely ministerial duty, he may not delegate to another his discretionary powers. 39 Cyc., at page 304, states:

"It is a general rule that a trustee in whom there is vested discretionary powers involving personal confidence cannot delegate his powers and shift his responsibility to other persons."

This court so viewed the law in *Jesseph v. Carroll,* 126 Wash. 661, 219 Pac. 429, where we said:

"As to the second objection, the general rule undoubtedly is that the trustee vested with a power which involves personal discretion and judgment cannot delegate the execution of the power to another."

See, also: *In re Wood's Estate,* 159 Cal. 466, 114 Pac. 992, 36 L. R. A. (N. S.) 252; *United States Fidelity & Guaranty Co. v. Taggart,* 194 S. W. (Tex. Civ. App.) 482.

The rule as we have stated it is not, we believe, seriously denied by the appellants, but they contend that all they did by signing the Title Trust Company contract was to delegate to that company only purely ministerial duties, reserving to themselves all matters of management and discretion. But this position cannot be maintained. It is plain that it was the intention of the contract to vest in the Title Trust Company nearly all of the discretionary powers which the will imposed upon the trustees. It is true, they continued throughout the period of the trust to act as trustees and, as such, made certain reports and some small remittances to the cross-appellant, but, after the transfer of the property to the Title Trust Company, they did practically nothing with reference to the estate or the property in behalf of cross-appellant, except to receive from the trust company certain sums of money some of which they remitted to her. Since the will

did not give to the trustees any power of delegation of duty or to appoint substitutes, it follows that, when they entered into the contract above mentioned, they unlawfully surrendered their discretionary powers as trustees for cross-appellant. It was their duty under the will, if they chose to serve as trustees, to take possession of the property themselves and handle it as their judgment dictated. This they did not do; but, on the contrary, they surrendered into the hands of another the powers which only they could lawfully exercise. It may be that they could not segregate her trust interest from the other interests without legal proceeding, but that method was open to them on the equity side of the court at all events.

[3] It is contended by the appellants that the cross-appellant was in Seattle when this contract was made, that she was then of age, and although she did not personally sign the contract, she knew that her trustees had signed for her and knew the contents of that instrument, and raised no complaint for ten years, but continued knowingly to accept benefits, if any, that flowed from the execution of the contract, and that for these reasons she is estopped at this time to claim that the trustees exceeded their power or are responsible for anything that the Title Trust Company did or failed to do. It is true that there is testimony which tends to show that the cross-appellant knew that this contract was being discussed and had been executed; but all of that testimony is of a very general nature, and, when closely read, goes no further than to indicate that the cross-appellant might have known of the execution of the contract and might have approved of it. She positively denies that she knew the contract was made, or that the trustees had practically abdicated and had transferred their authority and power to the substituted trustee. Her dealings, after the making of the

contract, were only with her trustees. The trial court found with her in this regard, and we do not find sufficient in the record to justify us in overturning the trial court's finding.

[4] It is further contended by appellants that the probate court of King county knew that this contract had been executed and knew that the Title Trust Company was exercising the powers given by it, and that that court, in effect, appointed the Title Trust Company as trustee instead of the appellants. It is more than probable that, had the trustees refused to accept the duties devolving upon them under the will, or, having accepted, desired to relieve themselves of those duties, they could have either refused to serve in the first place or later resigned; and under those circumstances the court would have had power to have appointed a successor. But these conditions do not exist. They never resigned their duties, they never asked the court to appoint some person in their stead, and the court never made any such order. We, therefore, cannot hold that the matter stands as though the trustees had resigned and the court had appointed the Title Trust Company in their stead.

[5] We now notice cross-appellant's contentions. The appraised value of the separate property of the deceased, at the time the property was turned over to the Title Trust Company on November 6, 1913, appears to have been a little over $45,000, and of the community property, a little more than $183,000. We shall adopt these figures as the real value of the estate at that time, since it is as near the real value as the record enables us to now determine. Cross-appellant's interest was then one-twenty-eighth in the $45,000 in value of the separate property of the estate, and one-twenty-eighth in one-half of the $183,000 in value of the community property of the estate, subject to the spe-

cific bequests, expense of administration and debts. It
is impossible to determine her then net interest in the
estate so valued, with mathematical accuracy. We
conclude, however, to fix it at $4,500 as the nearest pos-
sible approximation of the then value, from this in-
volved record. It appears from the evidence that, on
November 6, 1913, that being the date of entering into
the contract, the estate of the deceased was practically
settled and ready for distribution, and that, at or about
that time the trustees, but for the making of the con-
tract, would have come into possession of the interest
belonging to cross-appellant. The argument in her be-
half is that she is entitled to the value of her net in-
terest in the property of the estate at the time the
trustees so surrendered their power over her prop-
erty, with legal interest thereon from that date, less
such amounts as have been paid to her by the appel-
lant trustees.

The authorities seem to be practically harmonious in
holding that when a trustee unlawfully delegates and
surrenders his discretionary powers to someone else,
with reference to the control and management of the
trust property, he becomes a guarantor and is respon-
sible for any loss that may have resulted, whether or
not such loss can be shown to be the result of the dele-
gation of power; the theory being that it is against
public policy for one to delegate powers which have
been entrusted to him alone, and that the trustee who
has placed the trust property in the hands of others will
not, after the property has been lost, be heard to say
that the delegation of power was not responsible for
the loss and that, if he had performed his duties as
the law required, the loss would also have occurred.
The cases to which we refer are for the most part
where money has come into the possession of a trustee,
and he has agreed with his bondsman that money which

has been deposited in a bank may not be drawn out except on the check of both the officer and the bondsman. Upon these facts it is held that the officer becomes a guarantor and is liable to the *cestui que trust* for any loss on account of the failure of the bank, regardless of the direct cause of the loss. The question seems to have been first considered in the House of Lords in 1835 in the case of *White v. Baugh,* 9 Bligh, N. S. 181, 5 English Reports, House of Lords, 1261, wherein this view of the law was learnedly expounded and announced.

So far as we are advised, the first case on the subject in this country is *McCollister v. Bishop,* 78 Minn. 228, 80 N. W. 1118. There, Justice Mitchell, speaking for the court, said:

"The principle invoked is that, if a trustee enters into any arrangement with reference to the trust funds which surrenders or limits his control over them, he is guarantor of the fund, irrespective of his motives, or whether his surrender of control was the cause of the loss. This undoubtedly is the rule, and it is an eminently salutary one."

After a thorough examination of the question by the court in *In re Wood's Estate,* 159 Cal. 466, 114 Pac. 992, 36 L. R. A. (N. S.) 252, the doctrine above announced was followed. The syllabus in the L. R. A. report of the case well states, as follows, the substance of the opinion:

"A guardian who permits his surety to have control over his ward's deposit account, by requiring all checks to be countersigned by the surety before they will be honored, is liable for loss of the funds through the failure of the bank, whether or not the arrangement with the surety was the cause of the loss."

In the case of *United Fidelity & Guaranty Co. v. Taggart,* 194 S. W. (Tex. Civ. App.) 482, the same conclusion was reached, where the court said:

" . . . that appellant and his surety are unconditionally liable for the loss to the estate due to the failure of the bank, because of the act of the guardian in placing joint control of the ward's money with his surety, since fiduciaries who enter into an arrangement by which they surrender or limit their control of the trust fund become guarantors thereof, irrespective of their motives or whether their action was the cause of the loss."

Upon similar facts and after an elaborate discussion, the supreme court of Georgia came to the same conclusion in the case of *Fidelity & Deposit Co. v. Butler*, 130 Ga. 225, 60 S. E. 851, 16 L. R. A. (N. S.) 944. See, also, to the same effect: 1 Lewin on Trusts, 417, and 1 Perry on Trusts (6th ed.), § 443. No cases have been cited holding a contrary doctrine.

It is quite true that the facts of the cases cited are different from those involved here, but the principle is the same. In those cases, as here, the trustee surrendered possession of and control over the property which he alone was bound to look after. Following the reasoning of these authorities, it seems plain that when appellants delegated their powers to the Title Trust Company, they at once and thereby became guarantors and are liable for the value of the property as of that date, together with the legal rate of interest thereon from that time, to-wit: November 6, 1913.

It appears that cross-appellant, during the years 1913 to 1919 inclusive, received from her trustees, appellants, sums aggregating $574. Deducting this amount from her net interest of $4,500 value in the estate on November 6, 1913, leaves due her as of that date from her trustees, appellants, the sum of $3,926, upon which she is entitled to interest at the legal rate of six per cent per annum from that date. We are fully conscious of the fact that we have not measured the amount of cross-appellant's rightful claim against ap-

pellants with any sort of mathematical accuracy. Indeed, it is impossible to do so from the much involved record before us. We are, however, well satisfied with our announcement of the controlling principles of law applicable to such determination. Appellants are in no position to complain of want of exactness in measuring their liability.

The decree is set aside upon the cross appeal of the plaintiff, Ruth Tyler Meck, and the cause remanded to the superior court with direction to render a money judgment in her favor and against her trustees Behrens, Newell and Cavanaugh, and each of them, in the sum of $3,926, with six per cent interest per annum thereon, but not compounded, up to the time of the entry of such judgment. Such judgment may be satisfied in part by payment from money belonging to cross-complainant now in the hands of appellants and further enforced by execution or otherwise as provided by law.

Since it thus appears that cross-appellant will by our disposition of the case, obtain a judgment substantially more favorable to her than by the decree of the trial court, from which she has appealed, she is awarded her costs incurred in this court.

TOLMAN, C. J., BRIDGES, ASKREN, MITCHELL, and MAIN, JJ., concur.

HOLCOMB, J., (dissenting)—I dissent from the decision as to both the principal appeal and the cross-appeal.