### JENNINGS et al. v. SMITH et al.

(District Court, S. D. Georgia, N. E. D. April 28, 1916.)

*(Syllabus by the Court.)*

1. COURTS ☞272—FEDERAL COURTS—JURISDICTION—RESIDENCE OF PARTIES.
    The residence and citizenship of one necessary defendant in the judicial district and the appropriate division will, at the suit of a citizen of another state, draw to the court there the rights of all concerned, if essential to complete determination.

    [Ed. Note.—For other cases, see Courts, Cent. Dig. § 811; Dec. Dig. ☞272.]

2. EQUITY ☞22—JURISDICTION—ADMINISTRATION OF ESTATE.
    On the death of the decedent, where the state law authorizes administration by next of kin, or, in their absence, creditors, and before nightfall, without notice to any one, the dead man's bookkeeper and a neighbor, not a creditor, and another, not a creditor, and a judge of a superior court, all unrelated to decedent, apply for and obtain administration, equity will interpose to protect the endangered property rights of the citizens of another state.

    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

3. EQUITY ☞22—JURISDICTION—ADMINISTRATION OF ESTATE.
    This is especially true where the bookkeeper, after he is enjoined from changing the status of the estate, enters on the books of the deceased in his own favor a claim for back salary for $24,000, and the manager and judge are both heavily indebted to the estate; and appeal to equity is the more justified where one of the debtors obtaining administration in such manner on the day of death is a judge of the superior court, a court of general jurisdiction having power to redress such wrongs.

    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. EXECUTORS AND ADMINISTRATORS ⊚⇒17(6)—RIGHT TO APPOINTMENT AS AD-
MINISTRATOR—CREDITORS—UNLIQUIDATED CLAIM.

An unliquidated claim of a superior court judge for alleged profession-
al services to the decedent, in a state where such judicial officers are
prohibited to practice law, such services rendered during the incumbency
of such judge, will not be recognized in equity as a basis for the pretense
that such judge was a creditor of decedent, and therefore entitled to
administration.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 53–56; Dec. Dig. ⊚⇒17(6).]

5. EXECUTORS AND ADMINISTRATORS ⊚⇒20(7)—DISQUALIFICATION OF ADMINIS-
TRATORS—PROOF.

This is especially true where the decedent held the judge's promissory
note for a large amount, and when application was made on the day of
death for temporary administration on the ground that the applicants
were creditors, proof prima facie must be submitted to the probate judge
of the existence and genuineness of the debts upon which such claim is
based, and this was not done.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. § 96; Dec. Dig. ⊚⇒20(7).]

6. EXECUTORS AND ADMINISTRATORS ⊚⇒32(1—APPOINTMENT OF ADMINISTRATOR
—VALIDITY—EQUITY.

Where the statute law of the state provides, "No person shall be appoint-
ed administrator who is neither of kin to the intestate nor a creditor,
or otherwise interested in the grant of administration," such prohibition
is imperative; and an order disregarding it is null and void, and may
be so declared at the suit of any one lawfully concerned.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 191–200; Dec. Dig. ⊚⇒32(1).]

7. EXECUTORS AND ADMINISTRATORS ⊚⇒32(1)—APPOINTMENT OF ADMINISTRATOR
—VALIDITY—EQUITY.

This is especially true where the order is obtained by deceitful state-
ments that the applicants were within the eligible classes, when in fact
they were not.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 191–200; Dec. Dig. ⊚⇒32(1).]

8. EXECUTORS AND ADMINISTRATORS ⊚⇒32(1)—APPOINTMENT OF ADMINISTRA-
TORS—FRAUD—JURISDICTION IN EQUITY.

Such averments are jurisdictional, and, if false, they must be declared
fraudulent. Myers v. Cann, 95 Ga. 385, 22 S. E. 611. And a court of
equity in Georgia has jurisdiction to set aside the grant of letters of ad-
ministration obtained by such fraud. McArthur v. Matthewson, 67 Ga.
134.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 191–200; Dec. Dig. ⊚⇒32(1).]

9. EXECUTORS AND ADMINISTRATORS ⊚⇒32(1)—FRAUDULENT ADMINISTRATION
—EQUITABLE RELIEF—DEFENSE—KNOWLEDGE OF ORDINARY.

That the ordinary knew the falsity of such jurisdictional averments,
but nevertheless granted administration on the day of the decedent's death,
without notice to the next of kin, is no defense, and is to add collusion
to fraud.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 191–200; Dec. Dig. ⊚⇒32(1).]

10. EXECUTORS AND ADMINISTRATORS ⊚⇒538—PERSONS MEDDLING WITH DE-
CEDENT'S PROPERTY—LIABILITY.

"If any person, without authority of law, wrongfully intermeddles
with the personalty of the deceased individual whose estate has no regu-
lar representative, he should be held and decreed an executor in his own

wrong, and as such should be liable for double the value of the property so possessed or held by him." Park's Code Ga. § 3886.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2582–2589; Dec. Dig. ☞538.]

11. EQUITY ☞22—JURISDICTION—FRAUDULENT ADMINISTRATION.

The duty of a court of equity to interpose in such a case is intensified when it appears that the administrators thus appointed were the open partisans of certain parties claiming inheritable rights, and the antagonists of the plaintiffs; also where the administrators thus appointed indorsed the notes of the claimants they favor, and take liens on their distributive shares in the entire estate, in order to obtain funds to conduct the litigation of the resident claimants, and defeat the claims of the citizens of other states.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

12. EQUITY ☞22—JURISDICTION—FRAUDULENT ADMINISTRATION.

It is an additional ground for the interference of equity, when the judge of the superior court and others not entitled to administration represented to the ordinary that the personalty of the estate was worth $25,000, and gave bond in the sum of $50,000, when they all knew that such personalty was worth much more than $1,000,000, which was the fact, and the law obliged a bond of $2,000,000.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

13. EQUITY ☞22—JURISDICTION—FRAUDULENT ADMINISTRATION.

The law of Georgia (Park's Code, § 4596) providing that equity will not interfere with the regular administration of an estate except "upon the application of any person interested in the estate where there is danger of loss or other injury to his interests," affords in such a case statutory right for equitable relief.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

14. EQUITY ☞22—JURISDICTION—WRONGFUL ADMINISTRATION OF ESTATE.

Where, under the law of Georgia, the superior court judge of a judicial circuit has, as in this case, become disqualified, any other superior court judge of the state may grant the relief in equity provided by the Code section above cited.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

15. EQUITY ☞22—JURISDICTION—WRONGFUL ADMINISTRATION.

Where such a judge, on a bill with proper averments and prayers, appoints receivers and enjoins administrators unlawfully appointed from further interference with the estate, it is an additional ground for equitable relief that the parties defendant wholly refused to comply with such order and injunction, and for equitable action by the United States court to protect the alleged property rights of a citizen of another state thus endangered. This is especially true where the probate judge of a court of record and the sheriff of the county where decedent died appear as witnesses for the wrongdoers, one of them the judge of the superior court.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

16. EQUITY ☞22—EXECUTORS AND ADMINISTRATORS ☞122(2)—JURISDICTION—WRONGFUL ADMINISTRATION OF ESTATE.

Under the law of Georgia, temporary administrators have only the right to collect and preserve the estate. Where such administrators, appointed as above stated, pay the claims, lease or loan out mules and other live stock, lease large bodies of land in the highest state of cultivation, pay

alleged debts of the decedent, and enter a charge of $24,000 on the books of the decedent in favor of one of their number, who had been working for years at a monthly salary of $125, and made other expenditures in considerable amount, it will justify the interposition of equity with the administration. Park's·Code Ga., 3935; Baumgartner v. McKinnon, 137 Ga. 166, 73 S. E. 518, 38 L. R. A. (N. S.) 824.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. &#9901;22; Executors and Administrators, Cent. Dig. §§ 495, 495½; Dec. Dig. &#9901;122(2).]

17. EXECUTORS AND ADMINISTRATORS &#9901;116—WRONGFUL ACTS OF ADMINISTRA-TORS—ADMINISTRATORS' BOND—PLEDGE OF PROPERTY OF ESTATE.

Where the administrators thus appointed, after the bill in the District Court of the United States was filed, sought to give bond in the sum of $1,000,000 to secure the personalty, and deposit, in order to obtain surety thereon, stocks and bonds of the estate in the value of $500,000, under the joint control of a surety company, such action was in violation of their trust and contrary to public policy. Fidelity & Deposit Company v. Butler, 130 Ga. 225, 60 S. E. 851, 16 L. R. A. (N. S.) 944.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 484; Dec. Dig. &#9901;116.]

18. COURTS &#9901;490—EQUITY &#9901;44—EXECUTORS AND ADMINISTRATORS &#9901;32(1) —FRAUDULENT APPOINTMENT OF ADMINISTRATOR—JURISDICTION IN EQUITY —"COMITY."

"Comity" is courtesy, and courtesy cannot be available as a cloak for fraud; besides, comity is no shield for those who, as in this case, claim to be, but are not, officers of a court. A judgment of the probate court in Georgia granting permanent letters of administration to one who is neither next of kin nor a creditor, nor otherwise entitled to administration under the provisions of the Civil Code, may be set aside in a direct proceeding in equity at the instance of heirs at law on the ground that there was a false and fraudulent representation in the application that the applicant was next of kin to the decedent. Wallace v. Wallace, 142 Ga. 408, 83 S. E. 113. The same power of redress in equity obtains against a false and fraudulent averment that the applicants are creditors. In all cases of fraud, except in the execution of a will, equity has concurrent jurisdiction in Georgia with the courts of law. Park's Code Ga. § 4621.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1343, 1344; Dec. Dig. &#9901;490; Equity, Cent. Dig. §§ 141–145; Dec. Dig. &#9901;44; Action, Cent. Dig. § 144; Executors and Administrators, Cent. Dig. §§ 191–200; Dec. Dig. &#9901;32(1).

For other definitions, see Words and Phrases, First and Second Series, Comity.]

19. COURTS &#9901;371(2)—JURISDICTION—FEDERAL COURTS.

The remedies in equity afforded by state statutes may, with the proper parties and averments, be made available in the equity courts of the United States.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 907, 973; Dec. Dig. &#9901;371(2).]

20. EQUITY &#9901;22—JURISDICTION—FRAUDULENT ADMINISTRATION OF ESTATE.

When a judge of the state superior court, having jurisdiction in equity, is appointed administrator in the manner above described, and as such, shortly after his appointment, confers with the leading counsel of the administrators, and of the claimants whose cause they advocate, and after such conference such judge, on promise of the counsel that he will be "taken care of," resigns the judgeship, another person is the next day appointed as judge of the circuit, and the latter, on the application of the ex-judge thus resigning, now acting as solicitor, at once vacates the orders for the protection of the estate theretofore passed by the other

state court judge who had jurisdiction, the gravity of the appeal to the national court, by the citizens of other states, for the protection of their alleged property rights, seems enhanced.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 51–62; Dec. Dig. ☞22.]

21. EQUITY ☞363—JURISDICTION—SCOPE OF INQUIRY—FRAUDULENT ADMINISTRATION OF ESTATE.

On this preliminary hearing the disputed right to inheritance cannot be settled, but the plaintiffs, citizens of other states, have the right to be heard, and to have the evidence taken according to the established procedure in equity, and in the meantime to have the estate preserved. In its present condition, the estate is seriously in danger, it is largely in cash or its equivalent, and, since it is not in lawful judicial possession, it has not the protection which the law provides. The motion to dismiss is denied, and decree allowing injunction and appointing the receivers may be taken.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 762–766, 768; Dec. Dig. ☞363.]

Suit by one Jennings and others against one Smith and others. Motion to dismiss denied, injunction granted, receivers appointed, and an order made that the cause proceed in equity.

Callaway & Howard, of Augusta, Ga., John J. & Roy M. Strickland and E. K. Lumpkin, all of Athens, Ga., P. Cooley, of Jefferson, Ga., F. H. Colley, of Washington, Ga., and S. C. Upson, H. S. West, and T. J. Shackelford, all of Athens, Ga., for plaintiffs.

Hamilton McWhorter, of Athens, Ga., Sibley & McWhorter, of Lexington, Ga., Horace M. Holden and Cobb, Erwin & Rucker, all of Athens, Ga., E. F. Noel, of Lexington, Miss., Tye, Peeples & Tye, of Atlanta, Ga., D. W. Meadow, of Elberton, Ga., and Paul Brown, of Lexington, Ga., for defendants.

J. S. James and J. R. Bedgood, both of Atlanta, Ga., U. V. Whipple, of Cordele, Ga., Sam Swilling, of Royston, Ga., J. N. Talley, of Macon, Ga., C. F. Rhodes, of Yazoo City, Miss., and H. H. Perry and W. A. Charters, both of Gainesville, Ga., for interveners.

SPEER, District Judge. [1] The federal question in this case exists because the judicial power of the United States extends to controversies between citizens of different states. Plaintiffs are citizens of Louisiana, the defendants of Georgia, and many of the latter reside in the Southern district and in the Northeastern division, in which the bill was filed. The jurisdiction of this court, because of diversity of citizenship, is therefore clear. Jurisdiction in the territorial sense is equally clear. The residence of one necessary defendant in the district, in the appropriate division, will in proper case draw to the court there the rights of all concerned, if essential to complete determination; that is, to final decree.

Is there also jurisdiction in equity? The undisputed facts will answer. James M. Smith, on the 11th day of December, 1915, was visited by sudden death. Unmarried, a man of mysterious origin, abnormal methods of life, of strong and dominating mind, he had accumulated a fortune which many termed millionaire might well covet. As a peddler among a people in their utmost penury, he had

acquired the means of collegiate education. From the seat of his peddler wagon he stepped to the head of his class. His degree won, he repaired to the mountains where he was known, to borrow a paltry sum with which to buy the first acres of that landed domain which at his death a prince might have envied. The remorseless beneficiary of the intolerable system by which a state, founded to relieve the victims of legal oppression, for years farmed out to selfish greed the labor and the lives of its wayward, its unfortunate, its erring, and its felons, he drove his serfs in stripes and chains as the taskmasters of Egypt drove the ancient people of God. His whipping boss was a material witness.

With such unresisting, such frantic labor, in recurring harvests for all the years of his manhood life, his broad acres were white with the snowy luxuriance of cotton, or golden with corn and grain. Shrewd, economical, from the teachings of thrifty trade in the days of poverty, he well knew the value of every penny, and his amassment of wealth was sure, steady, and swift. While no adequate estimate had yet been possible, that his accumulations may be counted by millions may not be doubted. But the inevitable hour came. The strong man fell, and on that day the shades of night had scarcely fallen when his millions were in the hands of four men, two his salaried servants, one a neighbor without right, and yet another the judge of the only state court of general jurisdiction with power to resist the wrong and to protect those entitled to inheritance from loss and injury. These men are termed temporary administrators. They are Mitchell, the dead man's bookkeeper, Arnold, his neighbor, Holder, his manager, and Meadow, judge of the superior court.

To the dead man not one of them was even remotely related. While there were that day in the house of the dead, and about his corpse, those who it is now contended were of his inheritable blood, they were kept in utter ignorance of the scheme to seize administration. The four sped away after dark, found the ordinary, and obtained the appointment. The pretense for this precipitate action was the fear on the part of those acting that an illegitimate mulatto on the plantation (who claimed to be the son of James M. Smith), who at the time was under the influence of drink, would bring about a revolt or insurrection. To those who know the intrepid character of the white men of that section, this statement will not be impressive. Certainly it does not appreciably affect the mind of the court.

[2-5] Now by the state law certain classes are entitled to administration. One is the next of kin. The four men appointed were not kin at all. The same Code section (3943) provides that, where no application is made by the next of kin, a creditor may be appointed. We have seen that the next of kin had no opportunity to apply, and the appointees applied as creditors. But they were no more creditors than kin. One, Arnold, testified that Smith owed him nothing, and he owed Smith nothing. Mitchell, who had long before answered an advertisement for a bookkeeper, but who could not come until Smith had paid his board bill and bought his railroad ticket,

had annually received for his services the sum of $500 and his room and board. This man now (and after he was enjoined by this court from changing the status of the estate) entered on the account books of his dead employer a charge in his own favor of $24,000. A part of this he states was made up by "tacit" promises of Smith to pay him a yearly salary of $6,000. As a witness he is incompetent, for Smith is dead; but, if competent, his testimony would not seem probable. Against Meadow, Smith held a promissory note of $4,-000, and against Holder, similar notes of more than $20,000. Meadow's alleged claim against Smith is an unliquidated and indefinite demand for professional services rendered while himself a judge of the superior court. Since 1824, a superior court judge in Georgia is prohibited to practice law. Code, § 4837. He, too, as a witness, is incompetent. No proof was made before the ordinary that any of these men were creditors. They must offer proof before the probate court that they are creditors. Schouler on Wills, Executors & Adm'rs (5th Ed.) par. 1115. In fact, they were nothing of the sort, and two, at least, were heavily indebted to the estate.

[6] Another provision of Code section 3943, supra (clause 8): It provides:

"No person shall be appointed administrator who is neither of kin to the intestate, nor a creditor, nor otherwise interested in the grant of administration, except in the cases before provided."

[7-9] These men are within no exception. This prohibition is imperative, an order disregarding it is a transgression of authority, is utterly null and void, and may be so declared at the suit of any one lawfully concerned; especially null and void would be such an order when by fraud, without evidence or hearing, the order is obtained by deceitful statements that the applicants were within the eligible classes, when in truth and in fact they were not. The averment is jurisdictional. If false, it must be declared fraudulent, and the judgment thereby contained wholly void. The judgment of a court having no jurisdiction of the person and subject-matter, or void for any other cause, is a mere nullity, and may be held in any court when it becomes material to the interest of the parties to consider it. Code, § 5964. See, also, Myers v. Cann, 95 Ga. 385, 22 S. E. 611. There the president of a grocery company, which was a creditor, was adjudged ineligible, because not a creditor himself. The appointment of an administrator, not a creditor or next of kin, pronounced fraudulent, and sale by him set aside as void: Daniel v. Sapp, 20 Ga. 514. In McArthur v. Matthewson, 67 Ga. 134, Associate Justice Speer, for the unanimous court, declares that the grant of letters of administration by the ordinary may be set aside for fraud. "To do this equity has jurisdiction." The court cites Mobley v. Mobley, 9 Ga. 247, Wallace v. Walker, 37 Ga. 265, 92 Am. Dec. 70, and Markham v. Angier, 57 Ga. 43. In the more recent case of Neal v. Boykin, 129 Ga. 678, 679, 59 S. E. 912, 121 Am. St. Rep. 237, the doctrine is reasserted. The court quotes with approval the language of the learned and careful Mr. Justice Cobb in Jones v. Smith, 120 Ga. 642, 48 S. E. 134:

"If it could be made to appear that the judgment of the court of ordinary appointing the. * * * administrators was the result of a fraud perpetrated upon that court by a false representation, * * * it may be that the defendants would have a remedy by a direct proceeding in equity to set aside this judgment on the ground of fraud."

The court concludes that, if the letters of administration were the result of a fraud perpetrated on the court by false representation that the necessary jurisdictional facts did exist, a court of equity would have power to set aside the judgment on the ground of fraud in its procurement. That the ordinary knew the falsity but aggravates the wrong. Then collusion would be added to fraud.

[10, 11] These men are not administrators; they are not officers of the state court. The ordinary was prohibited to appoint them. Three days later two other administrators were appointed on the petition of the invalid appointees. One of these is a debtor and a stranger to the estate, the other is said to be next of kin, but neither the application, the method of appointment, the record, or the order is such that manifests in the ordinary jurisdiction to add either name. The estate, then, has no legal representative. This conclusion is inevitable, and the Code section 3886 declares:

"If any person, without authority of law, wrongfully intermeddles with * * * the personalty of a deceased individual whose estate has no legal representative, he shall be held and decreed an executor in his own wrong, and as such shall be liable * * * for double the value of the property so possessed or converted by him."

From the order of the ordinary, void for fraud as to the jurisdictional averment, fraud which plaintiffs and interveners had no chance to meet, void because the ordinary exceeded his power (and the rule of eligibility extends to the appointment of administrators of "any sort"), void for reasons of public policy, because an appointee was a judge from whom relief might have been sought (2 Shouler on Executors and Administrators [5th Ed.] par. 1114), the plaintiffs and interveners are nevertheless denied all right of appeal. This order of appointment, then, unless the relief here sought is granted, has placed the vast power and influence of the decedent's millions, of his lands, of his counsel, his employés and agents in the hands of men who, so far from being disinterested as the statute requires, are the avowed and immovable partisans of one class of claimants.

In their sworn answer they declare that the incontestable evidence shows the title in this class. It is composed of the descendants of Zadoc Smith. But this avowal in their answer, and this unequivocal declaration in favor of Zadoc Smith's descendants, is not all, nor indeed the most potent and dangerous partisanship, their conduct has disclosed. Money, much money, was essential to support the claim of those whose cause these illegally appointed administrators had espoused. How was this to be obtained? A committee of ways and means, composed of the self-appointed administrators and certain potential counsel, was convened. One of the administrators is a Mr. Arnold. He is a rich man, but does not esteem the possibility of dying rich as in even a slight degree a reproach upon his name and

fame. A proposal that he should finance the litigation of Zadoc Smith's progeny by two of his wives was greeted with Mr. Arnold's unwavering disapprobation. He, however, indorsed their notes of hand. The other appointed administrators also added their personal guaranty to negotiable paper, which otherwise might have been unmerchantable as the I. O. U.'s of Wilkins Micawber. But this financial expedient did not suffice. Mr. Andrew Erwin, with Mr. L. K. Smith, had been added to the list of temporary administrators. Mr. Erwin is a banker. Through his bank he arranged another loan for the descendants of Zadoc. This was for several thousand dollars, and was secured by liens on their distributive shares in the entire estate. If their right thereto is established, the security cannot be challenged; but can as much be said for the disinterestedness of these administrators?

The relating testimony of Mr. Erwin is as follows:

"Q. Now, Mr. Erwin, tell us what, if anything, you have done as temporary administrator to finance these people who claim this estate by reason of being descendants of Zadoc Smith? A. Well, I have indorsed note for Zadoc Smith for $350. I have indorsed note for Mr. Green and Henry Smith for $600. Q. Each? A. No, sir; $600 together. I secured loan for them, for the Mississippi heirs. Now, I don't remember how much I got for each one. Q. You say you secured, that you made yourself personally liable? A. No, sir; they put up their interest in the estate as security. I negotiated the loan for them. Q. What form is that security in? A. It is a first lien on their interest, as I understand it. I never saw the papers. Q. Who holds them? A. The Commercial Bank holds some, and the Georgia National Bank. Q. For how much? A. I cannot say. Q. In your opinion? A. They aggregate in the neighborhood of $3,000 or $4,000. Q. That goes to the Mississippi heirs, Mississippi claimants? Any other than the Phœby Smith descendants? I take it for granted that, when you speak of the Mississippi claimants, you mean those descended from Robert Smith. Now, then, are any others included in that arrangement, except those descended from Robert Smith? A. Yes; Zed Smith. I do not know who he is descended from. I do not know what the name of his father was; but Zed Smith, and Henry, and I believe John L. over there. * * * I have never seen that paper, drawn by attorneys of bank and turned over to officer of bank. I understand that it is a first lien on their interest in the estate. Q. And you secured that? A. Yes, sir. Q. Are you indorser on that in any way? A. No, sir; not on that. * * * I am vice president of the Commercial Bank. Q. Now, then, is there any other arrangement for paying or advancing money to any of these claimants? A. No, sir; not that I know of. Q. What hope or prospect have you to be reimbursed in the instances in which you became personally liable, in the event these persons for whom you indorsed do not recover this estate? A. In some instances I will get my money; in others, I will not. Q. You and they, in common, look forward to the recovery of this estate as the means of paying you, and reimbursing you? A. Yes, sir. Q. These obligations made to the bank, in which they have given a first lien on their interest in the estate, in the event they fail to recover their interest there, what is the prospect of the bank's collecting on that? A. Where secured by first lien only, I think it would be very slim. Q. So that the security of the bank there, of which you are vice president, is also largely dependent on their success in this litigation? A. Yes, sir. Q. Now, something has been said, Mr. Erwin, about advancing money to pay traveling and time, per diem, to various people who have attended as witnesses at Augusta and here. Tell us, please, just what that arrangement is? A. That is a note signed by the attorneys and administrators and heirs of Zadoc Smith's descendants for $2,000, made to the Georgia National Bank, out of which we pay their expenses and per diem. Q. (by the Court). You disburse the fund? A. Yes; I disbursed the fund myself. Q. You disburse the fund for the conduct of their litigation? A. That part of the $2,000 that has been expended. Q. (by Mr. Howard). Will

232 F.—59

you say just who are the parties to that note or obligation? A. N. D. Arnold— Q. N. D. Arnold is now temporary administrator? A. Yes, sir. Q. Is he one of the persons selected by the same claimants for permanent administrator? A. Yes, sir. Q. You are also selected for permanent administrator by them? A. Yes, sir. Q. Who else is selected for permanent administrator? A. L. K. Smith. Q. And this note for $2,000, for that purpose, that is in the national bank? A. The Georgia National Bank. Q. (by the Court). I would like to ask if the fund raised in the manner which you stated, where that fund is? A. It is in the Georgia National Bank, that portion that has not been expended. Q. All funds which have been raised for the purposes of the litigation, in the way you have mentioned, were deposited with the Georgia National Bank? A. Yes, sir. Q. Subject to whose check? A. Subject to my check, as agent. Q. As agent for the Zadoc Smith heirs? A. As agent for that fund, as I understood it. Q. Well, in whose interest are you agent? A. That is in the interest of the heirs. Q. The fund itself has no concern— A. That is in the interest of the heirs, the Zadoc Smith heirs."

Not without significance are the large credits the persons assuming to be administrators now accorded the descendants of Zadoc Smith. Some lived in a remote section of an adjoining county; some in distant states. If these newly discovered, these voluntary, philanthropists had ever loaned them, or either of them, a penny in all the past, the evidence does not disclose it.

[12] In the meantime other claimants of the vast inheritance appeared. They are the descendants of William and Lucinda Smith, late of Cobb county, Ga. They contend that James M. Smith is the son of William and Lucinda; that he left home early in life, enraged at the opposition of the family to his attachment to, and his desire to make his wife, a Miss Bullard, a girl of the neighborhood. These claimants live in Georgia and other states. They have intervened in the original bill before the court. They pray for the relief therein sought, and have submitted many affidavits and other proof. Uncontradicted, these would seem prima facie to support their claims. Through their counsel they became aware of the extraordinary proceedings in Oglethorpe county. They learned that Judge D. W. Meadow, through whose court they must seek redress, had himself gone with the others in decedent's care, and at 7 p. m. on the day of death, secured his appointment as administrator; that a debtor, he declared himself a creditor; that, with the others, he had stated to the ordinary that the personalty of the estate was $25,000, and then they had given a bond of $50,000, when the personalty in value was more than $1,000,000, and the bond should have been more than $2,000,000. Of these values Meadow, Mitchell, Holder, and Arnold must have had substantial knowledge. Meadow was for many years the decedent's special and confidential counsel. He had negotiated loans yet outstanding, nearly, if not quite, ten times the value of personalty he gave to the court. Mitchell, the dead man's bookkeeper, had also accurate knowledge. Holder, his manager, was himself a debtor in nearly the amount given the ordinary; and Arnold, probably the richest man in the county, save Smith, knew approximately the accumulations of his rival plutocrat. But we are not left to conjecture. Each of these men testified that they knew at the time they made out the application that the personal estate was more than $1,000,-

000, and in a short time (but not until the bill was filed in this court) they gave bond in that amount.

Other facts of grave import came to the knowledge of other claimants. Hopeless in that famous Northern circuit, whose renown has been made enduring by Toombs, the Stephenses, Hill, Lewis, Reese, Billups, Reed, Thomas, Andrews, and many another on the bead roll of Georgia's illustrious sons, they had to look elsewhere for initial justice—indeed, for the primal right to cross the threshold of a court of competent power.

[13, 14] When T. R. R. Cobb undertook the codification of the laws of Georgia, he included therein this salutary provision:

Section 3999, Code of 1895 (Park's Code, § 4596): "Equity will not interfere with the regular administration of estates, except upon application of the representative, either, first, for construction and direction; second, for marshalling the assets; or upon application of any person interested in the estate, where there is danger of loss or other injury to his interests."

To this remedy, these interveners here, who claim to be the heirs of William and Lucinda Smith, and through their inheritable blood entitled to the estate of their alleged brother, James M. Smith, now resorted. The record bristles with facts tending to show danger of loss and injury to those entitled.

[15] Judge Meadow, the judge of the Northern circuit, including Oglethorpe county, as we have seen, was now disqualified. By the laws of Georgia, any other superior court judge might act, and a bill to enjoin the amazing proceedings in that county with regard to this estate was presented to Judge Fite, of the Cherokee circuit. The averments of the bill were ample, injunction was granted, and receivers appointed. The receivers, one of whom was a solicitor general of the state, another an assistant United States attorney, and all men of character, hastened to Smithonia, which had been the home of the dead. The decree of the court was read to one of the administrators there, Mr. Mitchell. He also read the bill. He consulted by telephone with the leading counsel for the administrators, whose son-in-law had now been added to the list, now six in all. Mitchell, as he states, was advised to disregard and defy the decree of the state court of general jurisdiction, fully empowered to act. In any event he did this. The receivers of the state court were not only refused possession of the assets, but they were treated with marked personal disrespect. The hospitality at Southern plantations is widely known. The weather was freezing. When the receivers of the state court would shut a door to exclude the bitter cold, again and again it was violently slammed open. They were in an insolent way charged for their board and lodging, and yet the facts disclose that one of the illegal administrators has been removed from an adjacent county, has been quartered with his family, without any charge for rent, in the home of the decedent, that some expenditures from the estate have been made for his comfort, and that he is to be maintained there at the expense of the estate. They could not obtain any conveyance, and, though one of them had passed three score and ten, they were forced to walk four miles to reach the nearest train. But this is not all. When the sheriff was

asked to serve the decree of the superior court of the Cherokee circuit on the illegally appointed administrators, he obstinately refused, and left for his home. This official now appears as a witness for the defense!

The ordinary, judge of a court of record, is not content with exemplifications therefrom, but is also a deponent for the defense. It was then, perhaps, not wholly without justification, when the counsel for the receivers, a member of the bar of such distinction that he had been United States attorney for half of the state of Georgia, remarked to one of the servants of the administrators that the law made for all should control, this man replied: "That don't go in this county, when Marse Hamp says 'No.'" As the soldiers of Lee termed their hero chieftain "Marse Robert," so some of their sons and grandsons, it seems, there addressed the virile and versatile leading counsel for the defendants as "Marse Hamp."

But the men who had resolved to control the estate of the dead millionaire were now not without apprehension. The resolute character of the judge who had enjoined them was well known. He indeed at once instituted proceedings to punish the contemptuous treatment of his decree. It was seen that something must be done. In a neighboring city, but in another judicial circuit, lived Judge Charles H. Brand. He was awakened at 2 o'clock in the morning by counsel for the illegal administrators. They now prayed for an injunction to forbid their own clients from turning over the assets to the receivers of Judge Fite. The injunction was granted. It is not surprising that during the hearing before this court the counsel for the administrators should disclaim any defense or benefit flowing from the injunctive order of Judge Brand. It is, however, before the court, and we cannot shut out the light it affords on the daring purpose of those who sought it to hold in this astonishing way the vast possessions of the decedent, to win the hundreds of thousands involved in commissions, fees, and the like, with the probable effect of making a just and righteous inquiry, in the local courts, as to who are the lawful inheritors, utterly impossible to the plaintiffs, who are citizens of other states.

[16] Notwithstanding the injunction Judge Brand had granted in some "wee short hours ayont the twal," the forebodings of the subtle mentalities guarding and guiding the pseudo administrators were not altogether allayed. Judge Meadow had spiked his own battery. He was yet, however, the judge of the superior court of the Northern circuit, and of Oglethorpe county. It was thought necessary to get him out of the way. In this crisis he came, or was induced to come, to Athens. There he found the strong and resourceful mind of the leading counsel for the administrators. A brief consultation ensued between this gentleman and Judge Meadow. The latter in his testimony informs us it was agreed that a place would be found for him in connection with the estate. The promise was indefinite, but satisfactory. The judgeship he agreed to resign; but the judge and the ex-judge must now make haste. They had but a few minutes to spare. They caught the Seaboard Air Line for Atlanta. When they reached the

capitol, it was night. They had their supper, and sought the Executive. His Excellency was accessible. The situation was fully explained. The Governor acted doubtless with grave, but surely with brief, deliberation. With the speed of electricity a message was sent from the executive mansion to Mr. Worley. He was invited to come at once to Atlanta. But everything must be done decently and in order. It was concluded that the resignation of Judge Meadow could take full force and effect only under the dome of the capitol itself. Next morning the consummation ensued. Meadow put off the ermine, and Worley put it on. The new judge then homeward took his way, but not wholly unattended. Ex-judge (now Counselor) Meadow, and other counselors for the Zadocs and the administrators, were of the party. In accordance with the Napoleonic maxim, that victories must be swiftly followed up, in successive orders, all ex parte, the new judge and the gifted members of his bar fell upon Fite. The orders of the latter were "modified"; that is to say, they were annulled. Now, these decrees of the judge of the Cherokee circuit, in the orderly administration of justice, were of force until they were modified by himself or reversed by the proper appellate authority. They were, however, in this way set at naught. The pseudo administrators, wholly unembarrassed, paid claims, leased or loaned out the mules and other live stock, leased large bodies of land in the highest state of cultivation, paid alleged debts, one to a member of the illegal board, in whose favor, as we have seen, a charge of $24,000 was also entered on the books of the estate, and made expenditures in considerable amounts. None of these things could temporators lawfully have done. Code, § 3935; Baumgartner v. McKinnon, 137 Ga. 166, 73 S. E. 518, 38 L. R. A. (N. S.) 824. Their sole duty is to collect and take care of the effects of the deceased. Code, § 3935. In the meantime, no bond to secure the vast personalty of the estate had been taken.

[17] But now the bill before this court, at the instance of citizens of other states, was filed. It was instantly perceived that it was judicious to furnish some sort of protection to the large volume of liquid assets. To do this the putative administrators gave bond in the sum of $1,000,000. Their surety was a great bonding company. It is gravely to be doubted whether any state in their equivocal conduct was more hazardous or more abhorrent to public policy than the means by which the signature of the security on the bond was obtained. Among the other assets in the hands of the administrators were stocks and bonds of unquestionable value, to the amount of $500,000. Had these men been administrators de jure, with the possession of these securities, they could not part, save after formal proceedings, with public notice, and due order of the court. In fact, they placed them under the joint control of the surety company and themselves, and on special deposit in the National Bank of Athens. In this way the trust was made to become surety for itself. These large values of the estate were pledged as security against the misconduct or the mismanagement of the administrators. In 130 Ga. 225, 60 S. E. 851, 16 L. R. A. (N. S.) 994, in the case of Fidelity & Deposit Co. v. Butler, it has been held that such disposition of the assets of an estate to secure the bond

of a fiduciary agent is contrary to public policy. Indeed, so unequivocal was their misuse of these valuable assets that the bonding company, by formal offer in judicio pending the trial, asks and submits to the direction of the court with regard thereto.

[18-20] It is, however, insisted that this court is powerless to grant the relief sought by citizens of other states, because of their constitutional right to have their controversy determined here. It is urged that the doctrine of comity between the state and the United States courts will prevent it. Comity is courtesy, and courtesy cannot be available as a cloak for fraud. Besides, comity is no shield for those who, as in this case, claim to be, but are not, officers of a court. The principles of equity confer upon this court the power to enjoin such wrongs, and to take order to protect the assets in hazard "ratione materiæ," set forth in the averments of the plaintiffs' bill and amendments. It is an ancient doctrine of equity that the most solemn documents, even the judgments of a court, are vitiated for fraud, and no state has surpassed Georgia, either in its statutes as expressed in the Code sections, or in the decision of its highest appellate tribunal, in the maintenance of this doctrine. It is urged with great pertinacity that this doctrine does not apply to the administration of estates. It has, however, been expressly held by the Supreme Court of Georgia, in Wallace v. Wallace, 142 Ga. 408, 83 S. E. 113, that a judgment of the court of ordinary granting permanent letters of administration to one who was neither next of kin, nor a creditor, nor otherwise entitled to administration under the provisions of Civil Code, § 3943, "may be set aside in a direct proceeding in equity at the instance of heirs at law, on the ground that it was falsely and fraudulently represented in the application for letters of administration that the applicant was next of kin to the decedent." The same power would redress in equity a false and fraudulent averment that the applicants are creditors.

Great reliance was placed by counsel for the respondents on the line of authorities, beginning with the case of Broderick's Will, 21 Wall. 503, 22 L. Ed. 599, to the effect that a judgment probating a will could not be assailed for fraud. But even in that case it was held that, while equity would not disturb the operation of a will, it would give relief to parties injured, against those who are in possession of the decedent's estate or its proceeds mala fide, or without consideration.

The learned counsel for the administrators can perceive no distinction between a proceeding in equity against the probate of a will and one to restrain the action of administrators who secured their appointment by fraud and to the injury of the heirs at law. They contend that the administration of assets and the probate of wills stand upon precisely the same footing. The state of Georgia, however, has in a statutory way pointed out the distinction. Section 4621 of the Code of 1911 declared:

"In all cases of fraud (except * * * in the execution of a will) equity has concurrent jurisdiction with the courts of law."

The same Code section (4596), as we have seen, bestows upon equity the jurisdiction "to interfere with the regular administration of estates

upon the application of any person interested in the estate, where there is danger of loss or other injury to his interest." A fortiori, would this power be effective where the appointment of the administrator and the administration of the estate is irregular beyond precedent. Besides, the case of Broderick's Will is one of a long line of authorities, announcing the principle that, while alterations in the jurisdiction of the state courts cannot affect the equitable rights themselves remain, yet an enlargement of equitable rights by the state may be administered by the United States courts as well as by the courts of the state. It follows that whatever may be the rule in regard to a will, as we have seen, administration is placed by the law of the state on a different footing, and the remedy in equity afforded by the state statutes, with proper parties and averments, may be made readily available in the equity courts of the United States. Besides this, a long line of authorities, beginning with Ann Payne v. Zadoc Hook, 7 Wall. 425, 19 L. Ed. 260, and ending with Simon v. Southern Railway, 236 U. S. 115, 35 Sup. Ct. 255, 59 L. Ed. 492, confers the general equity jurisdiction, irrespective of statute, to afford such relief in the courts of the United States, even where the state has conferred exclusive jurisdiction of administration on its probate court.

[21] It is, however, urged that we should deny jurisdiction because in the present state of the case the heirs of Zadoc Smith show the stronger claim or right of inheritance. It would be surprising, in view of the financial and other assistance afforded them by the pseudo administrators and their counsel, was this otherwise. On this preliminary hearing, this right of inheritance cannot be settled. The plaintiffs, citizens of Louisiana, for the purposes of this hearing, show a sufficient claim. They show their right to be heard, and to have the evidence taken according to the established procedure in equity. We cannot close the doors of the court to their prayers for relief. Others, interveners, in varying degree, show an equal right. They, too, are entitled to be heard. It may not be doubted that many powerful influences combined to strengthen the claim of the heirs of Zadoc Smith. But it is the duty of a court of equity to bend the listening ear, and hear the plaint of the humblest and most obscure.

In the meantime the estate should be preserved. For the reason, then, that the appointment of the temporary administrators on the 11th of December, 1915, was procured by fraud, and that the ordinary, because of the prohibition of the statute, had no power to appoint them, it is for the purposes of this case held that they are not temporary administrators, or officers of the court, and that their possession of the estate of the late James M. Smith is not the possession of the state court, or its officers, but is the possession of executors de son tort. The appointment of the additional administrators, made on December 14th, is less culpable; but the record does not disclose their right to administration. They were added at the request of the first appointed, who are not administrators at all. One was not a creditor, but a debtor. Other reasons for the equitable relief sought are scarcely less cogent. In its present condition, the estate is seriously endangered. It is largely in cash, or its equivalent, and it has not the pro-

tection which the law provides. For these reasons, and for others that might be pointed out, the motion to dismiss is denied, and a decretal order may be taken, granting the injunction and appointing receivers in accordance with the prayers of the bill, the amendments, and interventions. The possession of such receivers will, in our judgment, be the first judicial possession of the assets of the decedent.

It is further ordered that the cause proceed as is usual in equity.